**SO ORDERED.**

**SIGNED September 18, 2008.**



_____
**ROBERT SUMMERHAYS**
**UNITED STATES BANKRUPTCY JUDGE**
_____


**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF LOUISIANA**


IN RE:

CAJUN FORGE COMPANY, INC.                    CASE NO. 03-51828

    Debtor                                   Chapter 11
------------------------------------------------------------------
CAJUN FORGE COMPANY, INC.

    **Plaintiff**

VERSUS                                       ADV. PROCEEDING NO. 04-5074

ANVIL INTERNATIONAL, INC.

    **Defendant**

------------------------------------------------------------------
**REASONS FOR DECISION**
------------------------------------------------------------------

The present matter before the court is an adversary proceeding brought by the debtor, Cajun Forge Company, Inc. ("Cajun Forge" or "Debtor") against Anvil International, Inc. ("Anvil"). Cajun Forge asserts breach of contract and fraud claims against Anvil arising

from a supply contract and facilities lease.  Anvil has asserted counterclaims against Cajun Forge contending that Cajun Forge breached the supply agreement and facilities lease.  The parties presented evidence and arguments supporting their claims during a two-day trial.  Following the presentation of evidence and arguments, the court took the matter under advisement.  After considering the evidence, the arguments of counsel, and the relevant authorities, the court rules as follows.

**JURISDICTION**

The case has been referred to this court by the Standing Order of Reference entered in this district which is set forth as Rule 83.4.1 of the Local Rules of the United States District Court for the Western District of Louisiana.  No party in interest has requested a withdrawal of the reference.  The court finds that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  These Reasons for Decision constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052, Federal Rules of Bankruptcy Procedure.

**SUMMARY OF THE RELEVANT FACTS**

**A.    The Parties.**

Federico Pirola formed Cajun Forge in 1994, and established a forging facility in Crowley, Louisiana.  Cajun Forge's primary

-2-

customer at the time was Capital Manufacturing. When that relationship ended around 2002, Cajun Forge began discussions with Anvil about forming a business relationship. Anvil manufactures a range of products, including pipe fittings and related equipment. Anvil is a Delaware corporation, and its principal business office is located in Portsmouth, New Hampshire. The present dispute centers on Anvil's forging facility in Fort Worth, Texas (the "Fort Worth Facility"). Anvil produced steel forgings at the Fort Worth Facility for use in its other products. By late 2002, Anvil had made the decision to stop producing its own forgings, to sell or lease the Fort Worth Facility, and to search for an alternative supply of the steel forgings that it needed for its other products.

**B.** **Anvil and Cajun Forge Negotiate a New Business Relationship.**

    **1.** **Cajun Forge Visits and Inspects the Fort Worth Facility.**

In late 2002, Anvil and Cajun Forge began to discuss a new business relationship in which Cajun Forge would lease the Fort Worth Facility and supply Anvil with a reliable, lower-cost source of forgings produced at the Fort Worth Facility. Mr. Pirola and his associate, Raffaele Raimondi, met with Anvil's representatives and visited the Fort Worth Facility on at least five occasions in late 2002 and early 2003. During these visits, Mr. Pirola and Mr. Raimondi observed the operation of the equipment at the facility, and took measurements of several pieces of equipment. At one

-3-

point, Anvil shut down its 2200 ton press so that representatives of Cajun Forge could inspect the press and take certain measurements of the equipment. Anvil also provided Cajun Forge with documents containing Anvil's historical production rates at the Fort Worth Facility. Mr. Pirola testified that, based on his observations at the facility, Anvil's production levels at the Fort Worth Facility were much lower than the production levels that Cajun Forge was attaining at its facilities in Louisiana. Mr. Pirola testified that Anvil's production process was outdated, and that Cajun Forge expected to increase the efficiency and output of the facility by modernizing the production process. To do so, Cajun Forge intended to (1) install new and refurbished equipment imported from Italy, (2) relocate some equipment from its Louisiana forging facility to Fort Worth, and (3) automate certain portions of the production process at the Fort Worth Facility. Mr. Pirola believed that Cajun Forge could increase production at the Fort Worth Facility by over 50%. However, Mr. Van O'Keefe (Anvil's Lonview, Texas plant manager) testified that Cajun Forge never provided Anvil with any specific information as to how it planned to increase production, nor did Cajun Forge indicate that it intended to increase production by increasing the rate at which the older equipment in the facility was to be operated. (October 10, 2007 Trial Transcript ("2 Tr.") at 206.) According to Mr. O'Keefe

-4-

and Mr. Albert Morgan (a manufacturing engineer for Anvil), Messrs. Pirola and Raimondi indicated that Cajun Forge had excess capacity at its Crowley plant and intended to transfer equipment from that plant to Fort Worth. (2 Tr. at 195, 206.)

### 2. Representations Made Concerning the 2200 Ton Press.

The present controversy centers on representations allegedly made by Anvil pertaining to two pieces of equipment at the Fort Worth Facility: a 2200 ton press and an induction heater. Cajun Forge contends that it was told that the 2200 ton press and heater could produce forgings at the rate of 5,500 pounds per hour. Anvil's witnesses testified that they told Cajun Forge that the maximum capacity of a new 2200 ton press and heater was 5,500 pounds per hour under ideal conditions based upon a well-known industry formula, but that the press and heater in question were over twenty years old. The production data provided to Cajun Forge showed that Anvil was not producing at 5,500 pounds per hour.

### 3. The Supply Agreement and Lease.

Anvil and Cajun Forge ultimately entered into a lease agreement covering the Fort Worth Facility and the equipment within the facility (the "Lease"), and a supply agreement requiring Cajun Forge to manufacture and deliver steel forgings to Anvil (the "Supply Agreement"). The Supply Agreement provided that Cajun Forge would supply approximately 70% of the forgings that Anvil

-5-

required for its own operations at a price that was lower than the price available on the open market. In section 1.02 of the Lease, Cajun Forge acknowledged that it inspected the facility and that the facility was in good order and condition:

> Tenant hereby acknowledges and agrees that Tenant has examined and inspected the Premises, that Tenant accepts the Premises as being in good order and condition and that the Premises comply in all respects with the requirements of this Lease and are in all respects suitable for the purposes intended by Tenant.

Sections 7.02, 7.03, and 8.02 of the Lease set out Cajun Forge's obligations with respect to utilities and maintenance:

> Throughout the Term, Tenant shall operate the Equipment at Tenant's own cost and expense. The Equipment shall be operated by fully qualified and duly authorized personnel only and shall be operated in accordance with any and all applicable laws and regulations. Tenant shall provide a suitable environment for the Equipment including but not limited to providing adequate space, electrical power, electrical connections, air conditioning and humidity control.
>
> . . .
>
> Tenant, at Tenant's sole cost and expense, shall maintain the equipment in accordance with the manufacturer's recommendation and shall perform any maintenance that upon inspection of the Equipment is deemed necessary by Landlord.
>
> . . .
>
> Tenant, at its own expense, shall make all replacements and renewals of all necessary or useful appliances, parts, instruments, accessories and miscellaneous property of whatever nature (collectively, the "Parts") necessary to maintain the Building and Equipment in good operation condition ("Tenant Repair"). Tenant shall be responsible for making all repairs and replacements

-6-

relating to normal wear and tear. In the ordinary course of maintenance, service, repair or testing, Tenant may remove Parts, but Tenant shall cause such Parts to be replaced as promptly as practicable.

Finally, Section 20.07 provides that:

THE PREMISES ARE BEING PROVIDED AND LEASED PURSUANT TO THIS LEASE ON AN "AS-IS, WHERE-IS" BASIS. LANDLORD HAS NOT MADE NOR SHALL BE DEEMED TO HAVE MADE ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AS TO THE TITLE, VALUE, MERCHANTABILITY, COMPLIANCE WITH SPECIFICATIONS, CONDITION, DESIGN, OPERATION, ABSENCE OF LATENT DEFECTS OR FITNESS FOR USE OF THE PREMISES (OR ANY PART THEREOF), OR ANY OTHER REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO THE PREMISES (OR ANY PART THEREOF). It is agreed that except as expressly provided herein, all risks incident to the matters discussed in the preceding sentence, as between Landlord, on the one hand, and Tenant, on the other, are to be borne by Tenant. The provisions of this <u>Section 20.07</u> have been negotiated, and, except to the extent otherwise expressly stated in this Lease, the foregoing provisions are intended to be a complete exclusion and negation of any representations or warranties by Landlord, express or implied, with respect to the Premises, that may arise pursuant to any law now or hereafter in effect, or otherwise.

C.  **Cajun Forge's Operations at the Fort Worth Facility.**

The Lease initially required Cajun Forge to occupy the Fort Worth Facility in April 2003. That date was, however, extended to June 30, 2003, at Cajun Forge's request. According to Anvil's witnesses, Anvil left behind spare parts for most of the equipment in the facility, and agreed to supply Cajun Forge with $80,000 of raw materials at cost. Cajun Forge contends that it encountered problems with the Fort Worth Facility from the day that it took

-7-

possession. Mr. Pirola and Mr. Raimondi testified that the induction furnace and the 2200 ton press could not produce 5,500 pounds per hour, and that the furnace would overheat and shut down if production was increased to more than 3000 pounds per hour. Mr. Pirola and Mr. Raimondi also testified that the 2200 ton press malfunctioned and could not be operated in a safe fashion. Cajun Forge also cited problems with the facility's 1000 ton and 700 ton presses, as well as defects in other equipment at the facility. As a result of these problems, Cajun Forge contends that it was never able to attain the production levels that it needed to comply with the Supply Agreement. Cajun Forge delivered several shipments of forgings to Anvil, but Anvil rejected one shipment of forgings on the grounds that they were defective. Cajun Forge contends that Anvil accepted shipments totaling $176,074.31, but never paid Cajun Forge for these shipments. Cajun Forge contends that it ultimately had to cease operations and vacate the Fort Worth Facility in early August 2003 because of the problems it encountered with the equipment at the facility. Cajun Forge officially notified Anvil that it had vacated the facility on or about August 14, 2003.

**D. Anvil Resumes Operations at the Fort Worth Facility.**

Anvil's witnesses testified that Anvil re-occupied the Fort Worth Facility within days after receiving notification that Cajun Forge had vacated the facility. According to Anvil's witnesses, Anvil was able to start production at the facility and achieve the

-8-

same level of output that Anvil achieved prior to turning the facility over to Cajun Forge.

**E.   The Present Proceedings.**

Cajun Forge filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on August 13, 2003. The Debtor's Chapter 11 Plan of Reorganization was confirmed on June 9, 2004. Anvil filed a proof of claim in the Debtor's bankruptcy case asserting a claim in the amount of $648,372.08, with a $472,297.77 "set-off" asserted as a secured claim. The claim sets forth an itemization of costs incurred due to the Debtor's failure to perform under the agreements as well as $99,600.00 as lease rejection damages for one year.

Cajun Forge objected to Anvil's claim and filed a Complaint for Damages against Anvil alleging that Anvil misrepresented the condition and capacity of the equipment at the Fort Worth facility. The Complaint sets forth the following causes of action: (1) breach of contract; (2) fraud and unfair trade practices; and (3) open account. Anvil asserted counterclaims alleging that Cajun Forge breached the Supply Agreement and the Lease.

## LAW AND ANALYSIS

**A.   Cajun Forge's Fraud Claims.**

**1.   Choice of Law.**

In <u>Klaxon</u>, the Supreme Court held that a court must apply the choice-of-law rules of the forum in which it sits when the court

has jurisdiction based on diversity of citizenship. <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). However, this court's jurisdiction over the present matter is grounded on 28 U.S.C. § 1334(b), not diversity under 28 U.S.C. § 1332. Even though not explicitly bound by <u>Klaxon</u>, bankruptcy courts generally apply the choice-of-law rules of the forum in which they sit over state-law claims that do not implicate federal policy. <u>Woods-Tucker Leasing Corp. of Ga. v. Hutcheson-Ingram Dev. Co.</u>, 642 F.2d 744, 748 (5th Cir.1981); <u>In re Gaston & Snow</u>, 243 F.3d 599, 605 (2d Cir.2001); <u>In re Merritt Dredging Co., Inc.</u>, 839 F.2d 203, 206 (4th Cir.1988); <u>In re Southwest Equip. Rental</u>, Inc., No. Civ. 1-90-62, 1992 WL 684872, at *9 (E.D. Tenn. July 9, 1992); <u>see also</u> <u>Warfield v. Carnie</u>, No. 3:04-cv-633-R, 2007 WL 1112591, at *7 (N.D. Tex. Apr.13, 2007). Here, Cajun Forge's fraud claim is based on the pre-bankruptcy dealings of the parties, and is grounded squarely on state law. Accordingly, this court will follow Louisiana choice-of-law rules.

Under Louisiana's choice-of-law provisions, delictual obligations such as fraud are generally controlled by Louisiana Civil Code Article 3542, which provides that issues involving delictual obligations are "governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue." The factors that courts should consider

-10-

under article 3542 include "the pertinent contacts of each state to the parties and the events giving rise to the dispute, including the place of conduct and injury, the domicile, habitual residence, or place of business of the parties, and the state in which the relationship, if any, between the parties was centered." La. C.C. Art. 3542. Applying article 3542 to the present case, the court agrees with Cajun Forge and Anvil that Texas law governs Cajun Forge's fraud claims. The focus of the parties' relationship and the present dispute is a facility located in Texas. Although some negotiations appear to have occurred in Louisiana, the representations that form the basis for Cajun Forge's claims occurred primarily in Texas. Accordingly, Texas law applies to Cajun Forge's fraud claims.

**2.   The Elements of Fraud Under Texas Law.**

To prove fraud, a plaintiff must establish by a preponderance of the evidence that: (1) the defendant made a material representation; (2) which was false; (3) the defendant made the representation knowing it to be false or made it recklessly as a positive assertion without any knowledge of its truth; (4) the defendant intended that the plaintiff act upon the representation; (5) the plaintiff acted in reliance upon the representation; and (6) suffered injury as a result. <u>Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.</u>, 960 S.W.2d 41, 47 (Tex. 1998).

-11-

A contracting party's failure to disclose information does not constitute fraud unless the party has a duty to disclose the information. See Bradford v. Vento, 48 S.W.3d 749, 755 (Tex.2001). A duty to disclose may arise (1) when the parties have a confidential or fiduciary relationship, (2) when one party voluntarily discloses information, which gives rise to the duty to disclose the whole truth, (3) when one party makes a representation, which gives rise to the duty to disclose new information that the party is aware makes the earlier representation misleading or untrue, or (4) when one party makes a partial disclosure and conveys a false impression. See Ins. Co. of N. Am. v. Morris, 981 S.W.2d 667, 674 (Tex.1998); Four Bros. Boat Works, Inc. v. Tesoro Petroleum Cos., 217 S.W.3d 653, 670-71 (Tex.App.-Houston [14th Dist.] 2006, pet. denied). Fraudulent inducement claims include the elements of a fraud claim in addition to proof that the plaintiff entered into a binding agreement as a result of the misrepresentation. See Haase v. Glazner, 62 S.W.3d 795, 798-99 (Tex. 2001) (providing that "with a fraudulent inducement claim, the elements of fraud must be established as they relate to an agreement between the parties").

   **3.  Has Cajun Forge Met Its Burden of Proof on All the Elements of a Fraud Claim?**

   *a.  Did Anvil make a false or misleading representation?*

   Cajun Forge's fraud claims are grounded on alleged misrepresentations with respect to the capacity and condition of

the 2200 ton press and the induction heater located at the Fort Worth Facility. Cajun Forge contends that Anvil told its representatives that the 2200 ton press and induction heater were capable of producing 5,500 pounds of forgings per hour. Cajun Forge contends that there were so many problems with the press, heater, and other equipment at the facility that Cajun Forge could not produce forgings at the 5,500 pounds-per-hour rate represented by Anvil. Cajun Forge further contends that it told Anvil's representatives that it planned to increase production at the facility, and that Anvil failed to disclose that the 2200 ton press and induction heater could not handle the increased production levels planned by Cajun Forge. Cajun Forge asserts that it relied on these representations in entering into the Supply Agreement and Lease and, had it known the truth about the condition of the facility and equipment, it would not have entered into these agreements. While Cajun Forge's complaint cites problems in the condition of other equipment at the Fort Worth Facility, Cajun Forge does not point to any specific alleged misrepresentations made by Anvil pertaining to the other equipment.

The record does not support Cajun Forge's contention that it was told that the *actual* capacity of the press and furnace at the facility was 5,500 pounds per hour. To the contrary, Mr. Morgan testified that Cajun Forge was told that the 5,500 pound-per-hour

-13-

figure assumed new equipment operating under ideal conditions, that the press and furnace at the Fort Worth Facility were over 20 years old, that the production conditions at the facility were not ideal, and that the actual production data provided to Cajun Forge was the best indicator of the actual capacity of the equipment. (2 Tr. at 138-140, 143-144.) Moreover, Mr. Pirola testified that he was familiar with the formula used to calculate the 5,500 pounds-per-hour figure, and that the formula provided the capacity "for an efficient machine." (2 Tr. at 44.) Anvil also provided Cajun Forge with production data showing that its historical production rate was less than 5,500 pounds per hour. Taken together, this evidence does not support Cajun Forge's claim that Anvil misrepresented the capacity and condition of the 2200 ton press and heater.

Cajun Forge also bases its fraud claim on alleged fraudulent ommissions. In other words, Anvil knew that Cajun Forge planned to increase production, yet failed to disclose that the 2200 ton press and induction heater could not handle the increased capacity. Cajun Forge can only prevail on a fraudulent omission claim if the record supports the elements of a duty to disclose under Texas law. The record in the present case does not support the existence of a confidential or fiduciary relationship.[1] Moreover, Cajun Forge does

---

[1]Under Texas law, fiduciary relationships arise from formal, technical relationships such as an attorney/client relationship,

-14-

not contend – nor does the record support – that subsequent events or information made earlier representations by Anvil false in light of new information. Accordingly, Cajun Forge must establish that Anvil had a duty to disclose because (1) Anvil voluntarily disclosed information, which gave rise to the duty to "disclose the whole truth," or (2) Anvil made a partial disclosure that conveyed a false impression. See Ins. Co. of N. Am., 981 S.W.2d at 674. In both cases, a duty to disclose arises when a party provides a partial disclosure that is misleading in light of withheld information.

Applying these standards to the present case, Cajun Forge has not established the presence of a duty to disclose. As discussed previously, the record supports Anvil's assertion that the 5,500 pounds-per-hour figure provided to Cajun Forge was couched as the theoretical maximum capacity of the press and heater when new, not the actual capacity of the press and heater at the Fort Worth Facility. Although Cajun Forge informed Anvil of its plans to increase production, Cajun Forge indicated that it intended to

---

or from informal, social, moral, or personal relationships of confidence and trust which impose greater duties as a matter of law. Lovell v. Western National Life Insurance Co., 754 S.W.2d 298, 303 (Tex.App.-Amarillo 1988, pet. denied). An arms-length commercial transaction between sophisticated parties does not generally give rise to a fiduciary relationship under Texas law. The record in this case does not support the existence of a fiduciary or confidential relationship between Anvil and Cajun Forge.

-15-

increase output by modernizing the production process and installing new equipment. However, Cajun Forge did not reveal any specific plans for increasing production, and did not indicate that it intended to increase production merely by running the existing equipment at a faster pace. (2 Tr. at 130-131; 195-196.) Considering the record as a whole, Cajun Forge has not established by a preponderance of the evidence that Anvil's statements about the capacity of the press and heater were misleading because Anvil failed to failed to disclose "the whole truth." <u>Ins. Co. of N. Am.</u>, 981 S.W.2d at 674.

> b. *Did Cajun Forge justifiably rely on a false or misleading representation?*

In order to prevail on its fraud claim, Cajun Forge must also prove reliance. In order to satisfy this element of fraud, Cajun Forge must prove that it actually relied on a false representation by Anvil *and that its reliance was justifiable*. <u>Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co.</u>, 51 S.W.3d 573, 577 (Tex. 2001). To determine whether reliance was justifiable, courts must consider whether it is extremely likely that there was actual reliance given the plaintiff's individual characteristics, abilities, and appreciation of the facts and circumstances at or before the time of the allegedly fraudulent transaction. <u>Beijing Metals & Minerals Import/Export Corp. v. American Business Center,</u>

<u>Inc.</u>, 993 F.2d 1178 (5th Cir. 1993) (applying Texas law).

As previously explained, the record does not support Cajun Forge's assertion that Anvil made a false or misleading representation regarding the press and heater. However, even assuming that Anvil had represented that the 5,500 pound-per-hour figure was the actual capacity of the press and heater, Cajun Forge has not established that its reliance on this representation was justifiable. Cajun Forge inspected the Fort Worth Facility and observed Anvil's production process during several visits to the facility and knew the production levels that Anvil was achieving. Based on these observations and the production data supplied by Anvil, Cajun Forge was aware that Anvil was not achieving a 5,500 pound-per-hour production rate. (2 Tr. at 45-46.) Cajun Forge also knew that it would have to make changes to the production process and equipment at the Fort Worth Facility in order to increase production. Finally, Cajun Forge's primary representative, Mr. Pirola, was not a novice in buying and operating forging facilities. Mr. Pirola testified that he has been in the forging business for over 40 years, and that he is familiar with the types of equipment necessary to operate a forge as well as the information needed in deciding whether to buy or sell a forging facility.

A defendant accused of fraud cannot defeat a fraud claim by arguing that the plaintiff could have uncovered the truth by

-17-

exercising reasonable due diligence. See Trenholm v. Ratcliff, 646 S.W.2d 927, 933 (Tex. 1983). However, if a fraud claimant's inspection or due diligence uncovers information that calls the defendant's representations into question, the claimant cannot blindly rely on the representations. In other words, a person may not justifiably rely on a representation if "there are 'red flags' indicating such reliance is unwarranted." Lewis v. Bank of America NA, 343 F.3d 540 (5th Cir. 2003) (applying Texas law). Assuming that Anvil had made the representations alleged, Cajun Forge has not proven that its reliance on these statements would have been justifiable considering the circumstances of the alleged representations, the knowledge and sophistication of Cajun Forge's representatives, the production data provided to Cajun Forge, and Cajun Forge's observations during its inspections of the facility. The inspections alone should have raised sufficient "red flags" indicating that the actual capacity of the press and heater at the Fort Worth Facility was not 5,500 pounds per hour.[2]

---

[2]The Lease also undercuts Cajun Forge's reliance argument. The Lease does not describe or warrant the condition of the equipment at the facility. Instead, the Lease provides that the facility is tendered on an "as-is, where-is basis," that Cajun Forge represents that it has inspected the facility, and that Cajun Forge acknowledges that the Fort Worth Facility was "in good order and condition and that the Premises comply in all respects with the requirements of the Lease and are in all respects suitable for the purposes intended by Tenant." Lease at §1.02.

-18-

*c.  Conclusion.*

For the reasons stated above, the court concludes that Cajun Forge has not met its burden of proving its fraud claims by a preponderance of the evidence. In light of these findings and conclusions, the court need not address whether Cajun Forge's claims are barred as a matter of law under Texas' <u>Schlumberger</u> doctrine.[3]

**B.    The Parties' Contract Claims.**

**1.    Choice of Law.**

As with Cajun Forge's fraud claim, the court must first address choice of law.  Cajun Forge and Anvil assume the application of Texas law based on the same contacts relevant to the choice of law for the fraud claims.  However, both the Supply Agreement and the Lease contain choice-of-law provisions providing for the application of Delaware law.  Section 20.14 of the Lease states that the lease "shall be governed by and construed in accordance with the laws of the State of Delaware ... as to all matters of validity, construction, interpretation, effect, performance and remedies."

---

[3] Under the <u>Schlumberger</u> doctrine, the inclusion of a merger clause or a disclaimer of reliance in an agreement may negate reliance, thus baring a fraud claim arising out of the agreement. <u>See</u>, <u>e.g.</u>, <u>Schlumberger Tech. Corp. v. Swanson</u>, 959 S.W.2d 171, 181 (Tex.1997) (holding that a disclaimer provision in settlement agreement defeated fraudulent inducement claim by negating reliance on pre-contractual representations).

Section 12.3 of the Supply Agreement similarly provides that the agreement "shall be governed by, and any matter or dispute arising out of this Agreement shall be determined by, the laws of the State of Delaware."  Given that these provisions are narrowly framed to apply to matters arising from the Supply Agreement and the Lease, these provisions apply to the parties' contract claims, but do not govern Cajun Forge's fraud claims. Benchmark Elecs., Inc. v. J.M. Huber Corp., 343 F.3d 719, 726-27 (5th Cir.2003)(holding that a choice of law clause stating that the "agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York" applied only to construction and interpretation of the contract and did not encompass plaintiff's claims of fraud and negligent misrepresentation); Thompson & Wallace of Memphis, Inc. v. Falconwood Corp., 100 F.3d 429, 433 (5th Cir.1996)(holding that a choice of law clause that applied to the "agreement and its enforcement" did not encompass tort claims because such claims were separate from the agreement and its enforcement).

   **2.   Cajun Forge's Contract Claims.**

   After considering the record as a whole, the court concludes that Cajun Forge has not met its burden of proof with respect to its claim that Anvil breached the Lease and the Supply Agreement.  These claims are grounded on the same allegations underlying Cajun Forge's fraud claims:  that Anvil misrepresented the condition and capacity

-20-

of the equipment at the Fort Worth Facility, and that this equipment was incapable of performing as represented. Delaware law provides that the rights, remedies, and obligations arising under a commercial lease are governed by general contract principles. 25 Del. C. §5101(b); <u>Lee v. Brown</u>, 2000 WL 33275028 at *2 (Del. Com. Pl. January 21, 2000). In other words, the starting point for assessing Cajun Forge's contract claim is the text of the Lease. The Lease contains no warranties, representations, or any other provisions with respect to the condition or capacity of the equipment at the Fort Worth Facility. Indeed, section 20.07 of the Lease expressly disclaims warranties and representations, and states that the facility was provided on an "as-is, where-is" basis.

This language precludes any claim that Anvil breached the Lease as a result of the condition of the Forth Worth Facility. Even if Cajun Forge could establish that Anvil made specific representations about the condition and performance of the equipment at the Fort Worth Facility, these representations cannot support a breach of contract claim given the express disclaimers in section 20.07 and the integration clause in section 20.15 of the Lease. Section 20.15 states that the Lease "sets forth the entire understanding and agreement of Landlord and Tenant with respect to the Premises; all courses of dealing, usage of trade and all prior representations, promises, understandings and agreements, whether oral or written,

are superceded by and merged into this Lease." The existence of an integration clause in a formal written contract between sophisticated parties is conclusive evidence that the parties intended the written contract to be their complete agreement. <u>J.A. Moore Const. Co. v. Sussex Associates Ltd. Partnership</u>, 688 F.Supp. 982 (D.Del 1988). The text of the Lease states that Anvil was making no representations with respect to the condition of the Fort Worth Facility. Moreover, section 1.02 of the Lease provides that Cajun Forge had the opportunity to inspect the facility, and that it "accepts the Premises as being in good order and condition and that the Premises comply in all respects with the requirements of this Lease and are in all respects suitable for the purpose intended by Tenant." In sum, the express terms of the Lease determine whether a breach has occurred, and Cajun Forge has not established that Anvil breached any of the lease terms.

With respect to Cajun Forge's claim for unpaid invoices, Cajun Forge introduced testimony and invoices supporting its claim. Of these invoices, Anvil disputes one invoice on the grounds that it never received the forgings reflected in that invoice. Anvil contends that, to the extent that Cajun Forge is entitled to payment of the other invoices, the amount it owes should be set off against the damages it suffered as a result of Cajun Forge's alleged breach of the Supply Agreement and Lease. Cajun Forge is entitled to

-22-

recover the price of goods accepted by Anvil. See 6 Del. C. §2-709. However, Anvil is entitled to deduct any damages it suffered as a result of a breach by Cajun Forge.

### 3. Anvil's Contract Claims.

Anvil contends that Cajun Forge breached the Lease and the Supply Agreement when it abandoned the Fort Worth Facility in August 2003 and ceased to provide forgings under the Supply Agreement. Cajun Forge responds that its performance was excused because of Anvil's prior breach of the agreements and alleged fraudulent representations. Alternatively, Cajun Forge contends that Anvil suffered no damages because it re-occupied the Fort Worth Facility within days after Cajun Forge left the facility and began to produce the forgings that Anvil needed for its operations.

The starting point for Anvil's breach of contract claims is the text of the parties' contracts. Section 16.01 of the Lease describes the "events of default" that trigger Anvil's remedies under section 16.02 of the Lease. Events of default under the Lease include failure to pay rent, failure to perform any obligation or covenant under the Lease, and any default under the Supply Agreement. The Supply Agreement does not list specific events of default, but provides that either party may terminate the agreement with notice "if the other party commits a material breach of any of its obligations hereunder (including, without limitation any breach

-23-

of or any untruth or inaccuracy in any representation or warranty made by the other party herein) which is not cured within thirty (30) days of written notice from the other party specifying the breach." This section also states that Anvil is entitled to terminate the Supply Agreement upon an event of default under the Lease. Since the subject matter of the Supply Agreement is the sale of goods, the agreement is also subject to Delaware's codification of the Uniform Commercial Code ("UCC"). <u>See</u> 6 Del. C. §2-101 et seq. Section 2-711 triggers a buyer's remedies under the code when "the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance with respect to any goods involved...." 6 Del. C. §2-711. Moreover, if the seller's breach "goes to the whole contract (§2-612)," then the buyer may also "cancel" the contract. <u>Id</u>.

The evidence in the record clearly shows that Cajun Forge (1) ceased operations and abandoned the Fort Worth Facility in early August 2003, (2) did not pay rent under the Lease after July 2003, and (3) did not provide any forgings called for under the Supply Agreement after it ceased operations in Fort Worth. Neither party really disputes that these actions amount to events of default under the Lease and a breach of the Supply Agreement to the extent that Cajun Forge was no longer supplying Anvil with forgings as required under the agreement. Moreover, given that Cajun Forge was no longer

-24-

supplying any of the forgings called for under the parties'
contract, its breach "goes to the whole contract" because the breach
"substantially impair[ed] the value of the whole contract."  6 Del.
C. §2-612.  Thus, in addition to damages, Anvil was entitled to
suspend its performance and cancel the contract.  Cajun Forge's
response – that Anvil committed fraud – does not excuse these
breaches.  As explained previously, Cajun Forge has not established
that Anvil committed fraud or that it breached either contract.
Anvil is therefore entitled to the remedies provided in the
contracts and in Delaware's codification of the UCC.

### 3.  Anvil's Damages.

#### a.  *Damages for breach of the Supply Agreement.*

Section 6.2 of the Supply Agreement sets forth the parties'
termination rights upon a material breach by the other party, but
does not provide any guidance on damages.  Turning to Delaware's
version of the UCC, Delaware Code sections 2-711, 2-712, 2-713, and
2-715 set forth the basic rules for determining Anvil's remedies
under the UCC.  Section 2-711 provides that, upon a default, the
buyer can (1) "cover" and seek damages under 2-712, or  (2) seek
damages for non-delivery under 2-713. 6 Del. C. §2-711 (2008).
Section 2-712 provides that "[a]fter a breach within the preceding
section the buyer may 'cover' by making in good faith and without
unreasonable delay any reasonable purchase of or contract to

-25-

purchase goods in substitution for those due from the seller." 6 Del. C. §2-712 (2008). The measure of damages under section 2-712 is "the difference between the cost of cover and the contract price together with any incidental or consequential damages as hereinafter defined (Section 2-715), but less expenses saved in consequence of the seller's breach." Id.

In the present case, Anvil covered in response to Cajun Forge's breach by purchasing some substitute goods from alternative sources, but primarily by resuming operations in Fort Worth and producing substitute parts in-house. Although section 2-712 refers to purchases on the open market, courts have held that a buyer may cover by producing substitute goods in-house. See, e.g., Dura-Wood Treating Co. v. Century Forest Products, Inc., 675 F.2d 745, 753-54 (5th Cir. 1982); 4A Anderson U.C.C. § 2-712:41 (3d. ed.) ("Cover is not limited to goods purchased in the marketplace, and may consist of goods manufactured by the buyer, when the buyer acts in good faith.")

As in the case of substitute goods procured on the open market, damages are determined in reference to the cost of cover and the contract price. Based on the record and pleadings, Anvil asserts the following damages related to the breach of the Supply Agreement:

(1) **$271,920.37** of payroll costs incurred by Anvil to operate the Fort Worth Facility after Cajun Forge vacated the facility;

-26-

(2) **$31,797.00** for the "incremental cost Anvil incurred in obtaining raw material on the open market as compared to the negotiated price under the parties' Supply Agreement"; and

(3) **$108,300.80** in severance that Anvil paid to its Fort Worth employees when it turned the Fort Worth Facility over to Cajun Forge in June 2003.

The $31,797.00 of "incremental costs" reflects the difference in price between the substitute goods Anvil obtained as partial cover and the price of the goods that Cajun Forge was to provide under the Supply Agreement. This damage item falls squarely within section 2-712. Cajun Forge responds that Anvil has not proven this damage item by a preponderance of the evidence because Anvil's trial witness, Mr. O'Keefe, could not "provide specifics" as to the calculation of the $31,797.00 figure. (Cajun Forge Post-trial Brief at 17.) After reviewing the record, the court agrees with Cajun Forge. Although Mr. O'Keefe generally testified that the $31,797.00 represented the amount that Anvil paid for substitute forgings over and above the price provided for in the Supply Agreement, Mr. O'Keefe could not testify as to how this figure was calculated, nor could he explain the nature, source and cost of the substitute goods, or the time frame of the purchases. In fact, the sole documentary support for this item in the record is a schedule of damages prepared by Anvil which merely lists this figure as a line item. The commentary to the UCC rejects "any doctrine that of

-27-

certainty which requires almost mathematical precision in proof of loss." Del. C. §2-715 cmt. 4 (2008). Accordingly, "[l]oss may be determined in any manner which is reasonable under the circumstances." Id. However, in order to satisfy its burden of proof, a claimant must offer more than a line item on a chart prepared by the claimant without any explanation as to how the figure was calculated. In the present case, the record simply does not provide sufficient information for Cajun Forge or the court to assess the reasonableness and validity of the $31,797.00 of "incremental cost" claimed by Anvil.

Turning to the $271,920.37 damage item, Mr. O'Keefe testified that the $271,920.37 of payroll costs represents the cost of re-hiring employees to operate the Fort Worth Facility and produce substitute forgings after Cajun Forge exited the facility. These payroll expenses are an element of the cost Anvil incurred to produce replacement products – in other words, they are an element of the cost of cover under section 2-712. However, the measure of damages under section 2-712 is the *difference* between the cost of cover and the price the buyer would otherwise pay under the contract, not the entire cost of cover. As Cajun Forge argues in its post-trial brief, Anvil incurred $271,920.37 in connection with producing forgings after Cajun Forge vacated the Fort Worth Facility. However, Anvil also eliminated the cost that, but for

-28-

Cajun Forge's breach, it would have otherwise incurred to buy products from Cajun Forge at the contract price. The record supports Anvil's assertion that it incurred temporary payroll costs that may have been part of its cost of cover, but the record does not include sufficient evidence to calculate damages under section 2-712 for the substitute products that Anvil produced in-house. To make this calculation, Anvil would have to account for the total cost of production attributable to producing the substitute goods, as well as the cost Anvil would have incurred purchasing forgings under the Supply Agreement but for Cajun Forge's breach _See_ _Dura-Wood Treating_, 675 F.2d at 753-54. The record simply does not include the evidence necessary to make this calculation. In sum, the $271,920.37 of payroll expenses is not recoverable based on the record.

Nor can Anvil recover the $108,300.80 in severance benefits that it paid to its employees before turning the Fort Worth Facility over to Cajun Forge. This item represents sunk costs Anvil incurred in order to comply with the Lease and Supply Agreement. It does not represent damages resulting from Cajun Forge's later breach, nor is it specifically recoverable under either the Lease or the Supply Agreement.

    *b.   Damages for breach of the Lease.*

Section 16.02 of the Lease enumerates Anvil's remedies upon a

-29-

default by Cajun Forge. Specifically, with or without terminating the Lease, Anvil may (1) "perform, correct or repair any condition which shall constitute a failure on Tenant's part to keep, observe, perform, satisfy, or abide by any term, condition, covenant, agreement, or obligation of this Lease" and receive compensation from Cajun Forge for the cost of doing so; (2) demand that Cajun Forge vacate the Fort Worth Facility; (3) reenter the Fort Worth Facility and "remove therefrom Tenant and all property belonging to ... Tenant"; (4) collect rent and all other charges due under the Lease from Cajun Forge until the Fort Worth Facility is re-let; and/or (5) if the facility is re-let, collect the difference between what Cajun Forge agreed to pay and the rent provided under the new lease. Section 16.02(e) provides an alternative measure of damages if Anvil exercises its right to terminate the Lease. Anvil identified the following damages related to the Lease:

    (1) **$8,300.00** for August 2003 rent;

    (2) **$99,600.00** for rent due during the remaining term of the Lease capped at one year under 11 U.S.C. §502(b)(6);

    (3) **$4,050.22** of repair costs that Cajun Forge was obligated to pay under the Lease;

    (4) **$1,536.83** for utility services (pro-rated from June 30, 2003 through August 26, 2003) that Cajun Forge failed to pay; and

    (5) **$8,127.00** for property taxes (pro-rated from June 30, 2003 through August 26, 2003) that Cajun Forge did not pay.

Starting with the unpaid utility bills and property taxes, Anvil is entitled to recover the full amount claimed for these items. Cajun Forge contends that it is not responsible for utilities and property taxes after it vacated the facility on August 3, 2003. The Lease does not support this argument. Section 16.02(d) states that Cajun Forge is obligated to pay rent and "all other charges due under this Lease." Nothing in this provision requires Anvil to pro-rate utilities or taxes to the date that Cajun Forge abandoned the property. Under sections 16.02(a) and (c), Anvil is also entitled to collect the $8,300 rent for August 2003, and the $4,050.22 for repair costs. The Lease obligated Cajun Forge to perform routine maintenance. The record supports Anvil's contention that the $4,050.22 was incurred for routine maintenance that Cajun Forge should have performed pursuant to the Lease.

The $99,600 in "lease rejection" damages presents a more difficult issue. Section 16.02(b) entitles Anvil to collect rent from Cajun Forge for the remaining term of the Lease, but only until Anvil re-lets the Fort Worth Facility. Although the lease is silent on Anvil's obligations with respect to re-letting the facility, Delaware, like most jurisdictions, requires a commercial landlord to mitigate its damages by attempting to re-let the leased facilities after the breach of a commercial lease. See, e.g., Manley v. Kellar, 94 A.2d 219, 221 (Del. Super. 1952). A commercial

-31-

landlord cannot recover damages that could have otherwise been avoided through reasonable efforts to re-let the leased premises. Id.  Cajun Forge contends that Anvil elected not to re-let the Fort Worth Facility, but instead resumed its own forging operations at the facility.  Accordingly, Cajun Forge contends that Anvil is not entitled to rent due after it reentered the facility in August 2003.

If the parties' business relationship was limited to the Lease, Cajun Forge's argument would have more force.  Cajun Forge's argument, however, ignores the Supply Agreement and the totality of the bargain struck by Anvil when it signed the two agreements.  A fundamental tenet of contract law in Delaware and elsewhere is that a non-breaching party is entitled to damages that restore to the non-breaching party "the benefit of its bargain" – i.e. expectation damages.  Duncan v. Theratx, Inc., 775 A.2d 1019,1022 (Del.Supr. 2001)(observing that "the standard remedy for breach of contract is based upon the reasonable expectations of the parties ex ante," and that this "principle of expectation damages is measured by the amount of money that would put the promisee in the same position as if the promisor had performed the contract").  In the present case, Anvil's bargain encompassed not only the Lease and rental income from the Lease, but also included the Supply Agreement and the promise of a reliable, low-cost supply of forgings to replace the forgings that Anvil had previously produced in-house at the Fort

-32-

Worth Facility. When Cajun Forge breached the Supply Agreement, Anvil elected to cover, in part, by resuming production at the Fort Worth Facility and producing replacement forgings in-house. The record supports the reasonableness of Anvil's use of in-house forgings to cover.[4] However, this effort to mitigate damages under the Supply Agreement precluded Anvil from re-letting the Fort Worth Facility. If Anvil is precluded from recovering the post-August 2003 rent merely because it used the facility to produce replacement goods, Anvil would not receive the full benefit of its bargain with respect to the Lease. Considering the record as a whole, and the terms of the Lease and Supply Agreement, the court concludes that Anvil is entitled to rent payments for the term of the Lease as provided under section 16.02 of the Lease even though Anvil did not re-let the facility during the remaining term of the Lease. However, these damages are capped at one year of rental payments under 11 U.S.C. §502(b)(6). Accordingly, Anvil is entitled to recover $99,600 representing the lease payments due for one year

---

[4]The commentary to section 2-712 states that the "test of proper cover is whether at the time and place the buyer acted in good faith and in a reasonable manner, and it is immaterial that hindsight may later prove that the method of cover used was not the cheapest or most effective." Del. C. §2-712 cmt. 2 (2008). Given Cajun Forge's exit from the Fort Worth Facility, the abrupt halt in the delivery of forgings from Cajun Forge, and Anvil's need for the forgings to continue supplying its own customers, the court concludes that this mode of cover was reasonable and that it was done in good faith even though the result of this mode of cover was that Anvil did not re-let the Fort Worth Facility.

-33-

under the Lease.  The total amount of damages awarded to Anvil as a result of Cajun Forge's breach of the Lease is $121,614.70.

      *c.    Additional damages claimed by Anvil.*

Anvil also seeks the following additional damages:

(1)  **$86,348.45** for raw materials provided to Cajun Forge; and

(2)  **$31,608.66** for material that Anvil purchased for use by Cajun Forge.

With respect to the $86,348.45 for raw materials, the record supports Anvil's claim, and Cajun Forge concedes as much in its pleadings.  However, Cajun Forge disputes the $31,608.66 item on the grounds that it represents unused materials that Cajun Forge left at the Fort Worth Facility for Anvil's use.  Anvil introduced invoices from a third party, SMI, showing that the materials were delivered to Cajun Forge at the Fort Worth Facility.  Although Cajun Forge speculates that this material was used by Anvil and Mr. O'Keefe testified that some material may have been left at the facility, there is no evidence in the record showing the ultimate disposition of the specific material covered by the SMI invoices. Once these items were delivered and accepted by Cajun Forge, it was obligated to pay for the goods, and any risk of loss shifted to Cajun Forge.  Accordingly, Anvil is entitled to recover the $31,608.66 claimed for the material delivered from SMI.

    **4.  Total Recovery by Anvil.**

In sum, Anvil is entitled to a claim of $121,614.70 for breach

-34-

of the Lease and $117,957.11 for additional damages (a total of $239,571.81). Cajun Forge is entitled to an offset for the products shipped to and accepted by Anvil. The invoices introduced by Cajun Forge show $176,074.31 of product shipped to and accepted by Anvil. Anvil disputes one of these invoices for $1,782.10 on the grounds that it did not receive the products described in the invoice. After reviewing the record, the court concludes that Cajun Forge has not met its burden with respect to this disputed invoice. Accordingly, after deducting $174,294.21 ($176,074.31 - $1,782.10) from the damages recoverable by Anvil, Anvil is entitled to a net claim of $65,277.60.

Within 20 days of the entry of these Reasons for Decision, counsel for Anvil shall submit a judgment in conformity with the foregoing reasons.

###